**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

LISA MILLE, *on behalf of herself and all others similarly situated*,

Plaintiffs,

v.

HOMETAP EQUITY PARTNERS, LLC; and HOMETAP INVESTMENT PARTNERS III SPV, and other related entities and individuals,

Defendants.

**Case No.:** 1:26-cv-7443

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

1. On behalf of herself and all others similarly situated, Plaintiff Lisa Mille, ("Plaintiff"), by and through her attorneys, respectfully alleges as follows:

**INTRODUCTION**

2. Over the last several decades, private-money interests have manufactured and adopted new predatory and abusive mortgage loan products that they peddle to the most vulnerable consumers, including homeowners or potential homeowners.

3. Defendants HOMEPTAP EQUITY PARTNERS, LLC; HOMETAP INVESTMENT PARTNERS III SPV, and other related entities and individuals (collectively, "Hometap") loan is another iteration of such products.

4. Hometap violates federal and state lending laws and attempts to avoid their protections by ensnaring homeowners with its complex, confusing, and high-risk loans branded by Hometap deceptively as "Option Purchase Agreements," then falsely and fraudulently contend and represent that "THIS IS NOT A LOAN."

5. Defendants' Option Purchase Agreements are loans.

6. They are loans with deceptive and illegal terms.

7. Hometap's product operates like any other loan, except they fail to adhere to the basis standards of loans and mortgages including for example disclosing rates and maintaining rates below certain thresholds.

8. In exchange for a cash advance paid to the consumer, Hometap receives a home mortgage-secured right to a percentage of the property's value which its contract describes as the "Hometap Share" or what it calls alternately the "delta." For example, after deducting fees and costs, a homeowner who receives $110,000 in cash from Hometap sells a percentage of their home equity worth nearly twice as much today and more than twice that amount over the ten-year term.

9. Hometap does not adequately disclose the ultimate cost of the loan to consumers like Plaintiff, but its investor materials tout the product's "downside protection, even during times of declining home values," through a "cushion in each property investment to minimize potential losses."

10. When a customer attempts to understand and clarify the amount owed and the timeframe, Hometap deliberately, deceptively, and purposefully evades a reasonable explanation that would allow the customers to make informed decisions. For example, when Plaintiff requested information and concrete terms about a potential home sale, Hometap provided her with a convoluted explanation that relied on a complex mathematical formula – yet failed to provide all the inputs and information necessary to complete the calculation.

11. Hometap's pattern and practice was to deceptively present the Option Purchase Agreement as something other than what it was, convolute the terms at initiation, fail to disclose

material information to consumers during the term, and then extract hard-earned equity and interest from customers.

12. For example, over the course of the ten-year term, the amount owed on the contract increases. During this time, the homeowner pays for all upkeep, repairs, improvements, taxes, insurance, and other costs related to the property, but does not pay down the principal to Hometap. When the Hometap loan comes due, the homeowner is required to pay back significantly more than they received from Hometap in one lump sum. If consumers cannot make that required payment to Hometap, Hometap can foreclose or otherwise force a sale to collect it, and thereby force consumers out of their homes without any of the protections required of a lender before foreclosing on a traditional mortgage. Worse, because Hometap's transactions are underwritten without regard to homeowner's income, assets, or future ability to pay the loan—and because Hometap targets homeowners who cannot qualify for or afford a traditional mortgage—a significant subset of homeowners are at risk of being forced out of their homes by the Hometap loan when their ten-year contracts mature.

13. Hometap markets to and targets individuals with low credit scores who are less likely than the general population to be able to refinance later. Further exacerbating their risk is the structure of the product with its single enormous lump sum payment due after a ten-year cliff, which can be extended at Hometap's sole discretion. Moreover, at the time of sale, Hometap will take much of the sale proceeds while the homeowners will have to cover all of the sale costs, making transition to a new home more onerous – and the deal lopsided.

14. To disguise that Hometap makes money as a lender and to avoid licensing, ordinary protections of the law, and substantive controls on its lending, Hometap frames its product as an "option agreement" rather than a loan, that is, in exchange for an upfront payment, Hometap

receives an "option" to acquire a percentage interest in the consumer's home, which vests after ten years.

15. This "option" language is a sham. It hides Hometap's guaranteed repayment of the entirety of the loan's principal by the borrower plus significant interest disguised as an equity share, all of which Hometap can recoup by forcing sale of the homeowner's home as collateral for its loan, through operation of the mortgage.

16. Hometap's own investor materials make clear that exercising its "option" under the contract means Hometap will "either foreclose on the property or force a sale of the property if the homeowner cannot otherwise settle."

17. No matter how Hometap labels its loan product, the reality is that it provides homeowners with an advance of money for a secured mortgage interest in their home, and then requires repayment at additional cost within 10 years or less. That is a mortgage loan. Plaintiff brings this suit to protect their family and others similarly situated from financial harm and to vindicate their rights under state and federal law.

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367.

19. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, including where Plaintiff resides in Bohemia, NY.

## PARTIES

20. Plaintiff Lisa Mille is an adult individual and consumer who resides at 1056 Locust Ave, Bohemia, NY 11716.

21. Defendant Hometap Equity Partners, LLC ("HEP") is a Delaware Limited Liability Company headquartered in Boston, Massachusetts.

22. HEP is the primary operating entity, employs all natural persons employed by Hometap, and negotiates and facilitates Hometap's real estate transactions.

23. HEP controls subsidiaries that are the contractual counterparties in transactions entered into by Hometap, such as Hometap Investment Partners III SPV, which entered into the instant contract with Plaintiff.

24. Defendant Hometap Investment Partners III SPV ("HIP") is a Delaware-registered, active special purpose vehicle associated with HEP. It is HEP's third institutional fund.

25. HEP and HIP have contributed assets to a common undertaking, that is, the transactions at issue.

26. HEP and HIP both expect profit from the undertaking, and both have a right to participate in the profit.

27. HEP and HIP are engaged in a joint venture, partnership, and/or civil conspiracy.

28. Alternatively, HEP is the principal of HIP and exercises control over and directs its actions.

29. HEP and HIP are collectively referred to as "Hometap" herein.

## FACTUAL ALLEGATIONS

### A. Hometap Contracts

30. All Hometap's so-called "Option Purchase Agreements" (referred to herein as the Hometap contract or Hometap product) have the same three core features:

a. Fast Cash: They provide upfront cash to homeowners without requiring documentation or underwriting of income, job, or assets other than the home itself. Hometap refers to this cash as the "Investment Amount" rather than what it is, the principal amount of a loan.

b. Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate but as described further below, Hometap's "capped" return routinely exceeds 20% annual interest.

c. Ten-Year Balloon: The homeowner is not required to make any installment payments to Hometap during the loan term. Instead, at the end of the ten-year term, the homeowner must make a single, very large payment to Hometap, unless Hometap decides to extend the term up to twenty years. Most homeowners will have fund this payment by selling their homes.

31. Hometap's form contracts contain the following: "Option Purchase Agreement" and state "THIS IS NOT A LOAN."

32. Under this loan contract, Hometap purportedly pays (but in reality *loans*) a sum of money to the homeowner, called the "Investment Amount."

33. This investment amount is paid back through a supposed option to purchase a percentage of the home's value in the future, called the "Hometap Percentage."

34. Hometap deducts certain fees and costs from the Investment Amount before the consumer receives the Investment Amount.

35. Some of these fees and costs are purportedly paid to third parties for typical mortgage closing services, such as for appraisals, title charges, and recording fees.

36. Hometap does not disclose the identity of the entity that is providing the services, nor the actual amount paid to that entity. Upon information and belief, some of the so-called "third-party costs" are actually retained by Hometap, because Hometap charges the homeowner more for closing services than the amount it pays to third parties for these services.

37. In addition, Hometap retains a 3% "Investment Fee."

38. Thus, for example, if Hometap offered a $100,000 "Investment Amount" to a homeowner, the consumer would actually receive less than $97,000.

39. Under the terms of the Contract, in exchange for the "Investment Amount," Hometap will receive a payment from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage").

40. The actual payment of that amount by the homeowner (which Hometap refers to in the contract as "settlement"), which will typically be paid through a voluntary or forced sale of the home, is called the "Hometap Share."

41. Under the Hometap contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events (such as a default in payments on other mortgages, default on property taxes or insurance, sale or transfer of the home, or "any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share").

42. The Hometap Share is, functionally, repayment of the original Investment Amount plus a profit.

43. The profit to Hometap, its return on investment, is a disguised finance charge for the original amount loaned to the homeowner.

44. Despite what Hometap tells consumers, its products are single-payment mortgage loans with a high rate of effective interest and/or exorbitant finance charges.

**B. Hometap Disguises the Loan Contract as an Option Contract**

45. Rather than disclosing its product as a loan, Hometap disguises the finance charge in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates or depreciates.

46. Contrary to Hometap's advertisements and investor disclosures, its product is not an option because:

a. Unlike with a typical option contract, the contract terms demonstrate that Hometap does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to so that that Hometap is paid back financially, primarily either through forced or voluntary sale.

b. The product shifts all risk and costs onto consumers and is designed to ensure that Hometap will always benefit from exercising the option, unlike a true option contract. These features include requiring homeowners to maintain the property in a certain condition, requiring the homeowner to maintain homeowners insurance and keep taxes up to date, establishing conditions on the sale of a home, requiring the homeowner to pay all closing costs both to enter the transaction and upon termination of the agreement, requiring the homeowner to live in the home and maintain the home as their primary residence, requiring the homeowner to pay Hometap fees during the course of the contract for various items, and severely restricting the homeowner from entering additional mortgage loans.

c. The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home which is not a feature of a typical option contract, and reflects Hometap's true intention that consumers pay back Hometap at a profit.

d. A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

e. A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Hometap has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise price" at the end of the ten-year term is either $0 or a nominal 1% of the cash amount loaned to the consumer.

47. The product is an advance of money that Hometap intends to be paid back at a profit—that is, a loan.

48. The product is secured by a mortgage on the homeowner's property.

49. The product contains various costs that are identical to those incurred with a loan.

50. Hometap refers to its product on its website as "financing." https://www.hometap.com/ (referencing "a fresh take on financing").

**C. Hometap's Product Puts Vulnerable Consumers at Risk**

51. Hometap advertises its product to cash strapped consumers as a means to pay off unsecured debt like credit cards and eliminate bills to enable a homeowner to "get closer to financial freedom." Hometap, https://www.hometap.com/ (last visited Nov. 9, 2026).

52. Instead, the product places a homeowner in a financial trap, stripping their most valuable financial asset—their home equity—from them at an extremely high rate of return for Hometap.

53. Indeed, Hometap's product restricts a homeowner's rights of ownership by not allowing the homeowner to rent the house, move, take on additional debts without Hometap's approval, or otherwise make personal decisions about the home such as transferring it to a family member. Loan Contract at § 6.

54. Hometap presents itself as being in a partnership with homeowners and working for the joint interest of itself and the homeowner, when in reality its goal is to maximize profit for investors – and pry equity from the true homeowners.

55. For instance, Hometap advertises that its product is: "Built for You. We put homeowners at the heart of everything we do. Our products are designed to help you meet your goals, and our team of real humans is here to support you every step of the way." https://www.hometap.com/ (Apr. 20, 2026). Hometap further touts "Our homeowner-first approach," https://www.hometap.com/, and states that it "invest[s] alongside homeowners," https://www.hometap.com/faqs.

56. Hometap also misleads consumers by touting that they will not have to sell their homes to access their home equity, when in fact the contract requires just that. https://www.hometap.com/ ("Access your home equity without having to sell or stress."); FAQs, https://www.hometap.com/faqs (asserting that it "provides homeowners with a fast, simple, and straightforward way to access the equity in their home without taking on monthly payments or having to sell.") (last accessed May 12, 2026).

57. Hometap further indicates that the loans require "no monthly payments," *id.*, without making clear that Hometap requires the homeowner to pay all costs associated with the home, including the first mortgage, taxes, insurance, homeowners' association fees, and repair and maintenance costs. Loan Contract at § 6.

58. And while Hometap repeatedly characterizes the product as "financing" to homeowners and investors, its contract claims that the payment is "not a loan or any other form of financing transaction," Loan Contract; see also Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

59. Prior to entering a Hometap contract, Hometap does not determine whether or not a homeowner can repay the Hometap product based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation.

60. Hometap's only evaluation prior to entering a Hometap contract pertains to a homeowner's ability to repay the Hometap contract through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

61. If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property . . . and [thereafter] solicit[] a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers . . . ." Loan Contract at § 3.1(b).

62. Hometap does this after years of requiring and relying on homeowners to invest in their own homes and ensure that the value of the home increases, ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

63. Hometap advertises specifically to homeowners who cannot afford monthly payments and asserts that their product will help them receive cash without selling. In reality, homeowners will not be able to refinance with a traditional loan at the end of the contract when the payoff has dramatically increased, because payments will be even more unaffordable. Instead, in direct contrast to Hometap's promises, the homeowner will be forced to sell—at considerable gain to Hometap and its investors.

64. Thus, the Hometap product is a high-cost mortgage loan that they misbrand as an investment rather than a loan to avoid federal and state lending laws.

**D. Plaintiff's Experience Is Typical**

65. In or around 2005, Plaintiff Lisa Mille purchased a home for in Bohemia, NY.

66. Around 2022 and shortly after the pandemic, Plaintiff sought financial assistance in handling credit card debt and found Hometap.

67. Hometap required Plaintiffs to grant a mortgage on their home, which secured their obligations under the contract on penalty of foreclosure (the "Mortgage"). Loan Contract at § 1.2(a)(iii).

68. Plaintiffs did not have any opportunity to negotiate the terms of the contract, as it was a standardized form contract.

69. Under Hometap's contract, the company claimed to provide her a "loan amount" of $110,000.00.

70. This loan amount was equivalent to 15.94% of the appraised value of the home. *See* Loan Contract at Section III: Investment Terms.

71. Under some scenarios if the term ran 10 years, Hometap's share of Plaintiff's home would balloon to 31.884% or nearly $268,178.28.

72. That equates to more than 22% interest on the loan, far in excess of legally allowable rates.

73. However, Hometap's corporate greed did not stop at their illegal interest rate and deceptive disclosures.

74. Hometap then layer its loan with junk fees.

75. As a result, Plaintiffs only received $103,345.55 of the loan amount due to the following junk fees and illegal deductions:

a. An "Investment fee" paid to Hometap of $3,850.00;

b. An appraisal fee paid to Hometap of $530;

c. Title fees of $1,754.45;

d. Mortgage recording fees of $520.00; and

e. $1,125.00 as a "State Tax (POC, Hometap)"

76. At the end of the contract, Plaintiffs would be forced to pay Hometap upwards of 31.884% of their home's value at that time if the property value went up, or 23.913% of their home's value if the home's value decreased. Loan Contract at Schedule A.

77. During the course of the loan, Hometap repeatedly and deceptively refused to disclose the actual terms and the correct figures to Plaintiff that would allow her to make an informed financial decision, including Hometap's ballooning interest in the property.

78. For example, Plaintiff attempted several conversations with Hometap individuals and was provide no clarification on the precise terms and amount owed on the loan at any given juncture.

79. Pursuant to the contract's terms, the contract ends at the first of the following events:

a. Plaintiffs sell their home in a sale on terms permitted by Hometap;

b. Plaintiffs default on property taxes, insurance, or homeowner's association dues on the property, or otherwise default on the contract terms;

c. The property is destroyed or condemned;

d. Plaintiffs otherwise pay off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e. Plaintiffs pass away; or

f. Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

80. Despite the hardship and deceptive nature of Defendants' communications and failure to disclose, Plaintiff resolved the loan within three years – to avoid more significant harm.

81. Plaintiff paid $155,577.05 to resolve the loan within 3 years.

82. That equates to more than 24.1% APR when compounded monthly – on both the loan itself and the junk fees she was required to pay. Plaintiff as a result paid usurious rates on both the loan amount and the junk fees, both in violation of New York law.

83. Such a 24% interest loan exceeds the amount allowed within New York. *See* GBL § 5-501 and Banking Law § 14-a.

84. Additionally, Hometap required Plaintiff to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home. Loan Contract at 6, § 2.4(g), 2.6(d).

85. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Plaintiffs must either buy out Hometap for hundreds of thousands of dollars that they don't have, or the company will force the sale of their home. Loan Contract at 8-9, §§ 2.7, 3.1.

86. Being forced out of their home would be a personal and financial disaster for Plaintiffs, who would be unlikely to be able to pay sales costs and fees and then qualify to purchase a new home after Hometap drained a huge portion of the equity from their home.

87. In around May 2025, Hometap began to provide quarterly "statements" to Plaintiff and other homeowners; it similarly instituted a tool on its website to predict the amounts that homeowners will owe on their contracts.

88. Hometap's further perpetuates its scheme through a chain of misleading and deceptive communications, including those that encourage homeowners to not pay off their contracts early, instead providing them a "10y forecast" of increased home equity for the homeowner and a chart with increasing home values. In fact, only Hometap will benefit from the homeowner waiting to pay off the contract.

**E. Federal and State Laws Protect Homeowners like Plaintiff from Hometap's Loan**

89. Congress and the New York legislature have both passed laws to protect homeowners like Plaintiff from complex and confusing financial products that can cause people to lose their homes.

90. While the federal Truth in Lending Act, 15 U.S.C. §1602 *et seq*. ("TILA"), protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

91. For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. *Id*. § 1639c(a)(1).

92. Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* § 1639b(b)(1)(A).

93. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* § 1639c(e)(1).

94. In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." *Id.* § 1602(bb). These include pre-loan counseling and additional disclosures. Id. § 1639(a), (h), (u).

95. New York Law protects consumers from "unfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce," *see* "New York General Business Law" (GBL) § 349.

96. New York Law also protects consumers from "false advertising in the conduct of any business, trade or commerce," *see* GBL §§ 350, 350-A.

**F. Hometap Does Not Comply with Federal and State Lending Laws**

97. Hometap falsely claims that it is entirely exempt from any federal and state lending laws discussed above because its product is not a mortgage loan.

98. Hometap is not licensed to originate and/or make mortgage loans in New York.

99. But no matter how Hometap labels its product, it is still a mortgage loan because Hometap provides homeowners with an advance of money, receives security through a mortgage on their home, and defers repayment until the end of the contract, to occur within 10 years. In other words, homeowners have the obligation to repay Hometap, by the very terms of the product. Those features create a mortgage loan.

100. Hometap ensures that, in practice, it will obtain repayment (plus a substantial finance charge) of its initial advance payment because all of the conditions for the conclusion of the contract require Plaintiff to pay Hometap.

101. In this case, Hometap paid Plaintiff roughly 15% of the value of her home and Hometap claimed the ability to receive up to 31.884% of the home's value.

102. Upon information and belief, Hometap will not issue one of its products unless it anticipates significant appreciation of the home. As a result, not only does the percentage of the home's value that Hometap will be paid increase, but the real dollar figures (the denominator by which the payout is calculated) also increases.

103. In reality, Hometap anticipates that its products will reach the 20% APR cap almost on every loan. As a result, the product functions exactly like a traditional loan: the homeowner takes out a debt and then repays it, with 20% or more interest.

104. While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid

even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

105. To further ensure that nothing will decrease the value of the home or jeopardize its future payment, Hometap requires Plaintiff to pay for all of the taxes, insurance, and repairs on the home. Loan Contract at 17, § 6.1(j); 18, §6.2(e). Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. *Id.* at 19, §7.2(b).

106. Despite the fact that Plaintiff must make these payments or face foreclosure, Hometap misleadingly advertises its product on its website as being "without payments" and requiring "no monthly payments" until one of the triggering events occurs.

107. Hometap also ensures that it will be paid back, with a profit, by limiting the homeowner's ability to rent out the home or leave the property. *See* Loan Contract at § 6.1(b); *see also* https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (at 30:02, explaining that the homeowner will pay for upkeep of the property and ensure that its value increases, unlike a renter).

108. Hometap also ensures that it will be paid back, with a profit, by capping the amount of any additional home secured debt that the homeowner can take on. Loan Contract at § 6.1(i).

109. Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can "in its sole discretion" calculate the value of the "Hometap Share" based on appraisal instead of the sale price. Loan Contract at 5, § 2.1(b). Hometap can also effectively delay the sale by requiring sworn documentation from both the owner and buyer.

110. Hometap confirms this in its statements to investors. For instance, Hometap states that it has a "Proven track record" including "8+ years delivering strong, risk-adjusted returns,"

"[p]ortfolio-based risk sharing in both rising and declining home value environments," and a "[s]trong 2.2x Sharpe ratio." https://invest.hometap.com/; *see also id.* (touting that "investors reap the benefits of U.S. home price appreciation without the complexities that historically come with large-scale residential real estate investing."); *id.* (Hometap explains that a "combination of data science, technology, thorough underwriting creates high quality assets"—that is, a high rate of return); IPE Webinar: Home Equity Investments: An Untapped Asset Class/Hometap, https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (explaining that Hometap has a "very big focus on technology and data science . . . for ensuring that we're creating a really strong portfolio for capital").

111. Hometap explains that they "structure these [products] in a way that we're able to create meaningful downside protection for capital" and that it recognizes that "we have to deliver appropriate risk-adjusted returns for investors who care about downside protection and Sharpe ratios." https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s. *See also* Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing at 8 (2025) (noting that Hometap's securitizations of its contracts "serve a wide range of investors, from hedge funds targeting particular returns, to insurers prioritizing lower risk"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

112. Hometap also recognizes that it is marketing to homeowners who have no ability to repay the loans, other than through loss of their homes. https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (noting that the product appeals to people who "just can't take on . . . more debt"; later explaining that increased homeowner cost-of-living and inability to take on additional traditional debt "translates into an opportunity for capital . . to earn a really strong relative risk adjusted return").

113. Hometap has also structured its product to have a ten-year maturity date to ensure that it will not take a loss: Hometap CEO Jeffrey Glass has explained that there "only three time periods in American history where over a 10-year period the average home in America has had any level of realized decline" and that even then, the amount of decline has been minimal. https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s

114. Despite the ten-year contractual period though, Hometap notes that because of refinances and sales, "we'll always see a percentage of the portfolio turn each year and that provides the cash flow back to investors." https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s at 37:18.

115. In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus a profit—at a benefit to investors and a huge loss to homeowners.

**G. Hometap's Own Documentation Refers to Its Product as a Mortgage Loan**

116. While Hometap has gone to great lengths to present its product as something other than a mortgage loan, it is undisputed that Hometap has a mortgage on Plaintiff's home.

117. Several of Hometap's documents for the transaction refer to Hometap as a "lender" and Plaintiff as "borrower." *See* Plaintiff's Investment Disclosures (listing Hometap Equity Partners, LLC as the "Investor" and Lisa Mille as "Borrower(s),").

**H. Hometap Unlawfully Tries to Limit Consumers' Rights**

118. Upon information and belief, Hometap is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt. Hometap's conduct in this case was willful and intentional.

119. Hometap's contract contains a number of provisions designed to limit the ability of homeowners to vindicate their rights in court.

120. The contract includes a mandatory arbitration clause. Loan Contract at 23-25 § 8.13. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1).

121. The contract also seeks to strip Plaintiffs of their right to statutory remedies, including punitive and consequential damages. Loan Contract at 21 § 8.1. No matter how much harm the company causes Plaintiffs or how many laws it violates, the contract provides that "IN NO EVENT WILL [Hometap's] AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT." *Id.*

122. The contract also seeks to immunize Hometap by stating that "We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct." Loan Contract at 22 § 8.8.

123. The contract's indemnification clause also purports to put Plaintiffs on the hook for Hometap's legal expenses for a wide range of claims, independent of the outcome of the litigation. Loan Contract at 21 § 8.1.

124. These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights.

## I. Hometap's Predatory Business Practices Contribute to its Rapid Expansion

125. Hometap is a rapidly growing company, and it now boasts that it has over 14,000 customers across the U.S. Hometap, Home Equity Investments: The Tipping Point for Alternative Financing at 16 (back cover) (2025), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

126. Getting homeowners to sign these mortgage loans is just the first step in Hometap's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

127. The four largest "home equity investment" loan companies have securitized approximately $1.1 billion, backed by about 11,000 home equity contracts, in the first 10 months of 2024. *Id*. (citing Home Equity Lending News, HEI Year-to Date Issuance Surpasses $1 Billion (Sept. 24, 2024), available at https://www.hel.news/articles/mbs/htap-2024-2-092424/).

128. According to a trade publication, "Hometap's fifth securitization highlights its established capital markets presence and track record scaling securitization activity alongside capital deployment. To date, Hometap has deployed over $2 billion in home equity investments and served more than 20,000 homeowners." https://www.citybiz.co/article/741421/hometap-closes-300m-securitization-of-hometap-originated-home-equity-investments/.

**CLASS ACTION ALLEGATIONS**

129. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed classes defined as follows:

> **TILA Nationwide Class:** All persons who have entered into an Option Purchase Agreement with Hometap within the time period commencing three (3) years prior to the filing of this action and extending upon through the date of class certification.
>
> **New York Class:** All persons who have entered into an Option Purchase Agreement with Hometap secured by a property located in New York.

130. Plaintiff reserves the right to amend the definitions of the classes above based on discovery or legal developments.

131. **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements in the State of New York and Nationwide.

132. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. The common legal and factual questions include, among others:

a. Whether Hometap's Option Purchase Agreements are mortgage loans;

b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

c. Whether Hometap's Option Purchase Agreements violate federal and state consumer protection laws such as TILA;

d. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to rescission of their agreements, as well as statutory, actual and punitive damages;

e. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

f. Whether Hometap acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

133. **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each Class member. Plaintiffs have the same claims for statutory, actual and punitive damages that they seek for absent class members.

134. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Class. Her interests are aligned with, and are not antagonistic to, the interests of the members

of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously. Plaintiff has no interests which conflict with those of the Class. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel. Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiffs and Class members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

135. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## CAUSES OF ACTION

### COUNT 1
**Truth-in Lending Act, 15 U.S.C. §1602 *et seq*.**
**(Class Claim – TILA Nationwide Class)**

136. Plaintiff incorporates by reference each allegation set forth above as if set forth at

length herein.

137. The contracts at issue in this action from Hometap are an extension of consumer credit that is subject to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and Regulation Z, 12 C.F.R. Part 1026 (collectively, TILA).

138. The contracts at issue are "residential mortgage loans" as defined by 15 U.S.C. § 1602(dd)(5).

139. The contracts are for the extension of credit and require the payment of a finance charge, as those terms are defined in 15 U.S.C. §§ 1602(f) and 1605 and Regulation Z § 1026.4.

140. Specifically, Hometap granted Plaintiff the right to defer payment of a debt when it gave her funds upfront (approximately 15% of the home's then-value) and deferred repayment of that debt until certain triggering events required them to pay up to 31.884% of their home's value at that later time.

141. The difference between the Investment Amount and the Hometap Share includes a finance charge.

142. The credit was offered to a consumer for personal, family, or household purposes.

143. The contracts are secured by Plaintiff's dwelling.

144. Hometap is named as the payee on the face of the contract and regularly makes this type of contract pursuant to the requirements of TILA, rendering it a creditor subject to TILA. 15 U.S.C. § 1602(g).

145. Hometap violated TILA and Regulation Z including by not limited to:

a. entering into the contracts with Plaintiffs while being unlicensed to originate mortgage loans in New York, 15 U.S.C. §1639b(b)(1)(A);

b. failing to make a reasonable and good faith determination that Plaintiffs had the ability to repay the loans, 15 U.S.C. § 1639c(a);

c. failing to provide Plaintiffs with any of the disclosures that TILA requires for residential mortgage loans, *see* 12 C.F.R. §§ 1026.1 *et seq.*;

d. including a mandatory arbitration clause in the contract, 15 U.S.C. § 1639c(e);

e. failing to comply with TILA's requirements for high cost mortgages, despite that Plaintiffs' loan is a high-cost mortgage as defined therein, 15 U.S.C. §§ 1602(bb)(1)(A)(i)(I), 1639;

f. in the alternative, failing to comply with TILA's reverse mortgage protections, despite that the loan (alternatively) is a reverse mortgage as defined by statute, 15 U.S.C. §§ 1602(cc), 1648.

146. Plaintiff hereby rescinds her transactions with Hometap, pursuant to 15 U.S.C. § 1635.

147. As a result of the violations of TILA, pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiff seeks rescission of their transaction, including a declaration that Plaintiff is not liable for any finance charges or other charges imposed by Defendant; termination of any security interest in Plaintiff's property created under the transaction; return of any money or property given by the Plaintiff to anyone, including the Defendants, in connection with this transaction; actual damages; an amount equal to the sum of all finance charges and fees paid; an award of reasonable attorney's fees and costs; and all other appropriate relief to the class as permitted by statute or law.

## COUNT 2
## New York General Business Law § 349
## (Class Claim)

148. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

149. New York General Business Law ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

150. Defendants engaged in deceptive, unfair, and unlawful trade practices in the conduct of trade or commerce and furnishing of services within the state of New York, in violation of N.Y. Gen. Bus. Law § 349(a) by deceptively marketing and characterizing its product as not being a loan or a mortgage when in fact the transaction was a loan with all of the risk undertaken by Plaintiff and not Defendants.

151. Defendants engaged in a pervasive deceptive scheme, whereby Defendants (1) deceptively inducing customers into utilizing Defendants' services based on deceptive and inaccurate documents, statements, and advertising pieces, (2) disguising its usurious loan practices, (3) layering and pilling on junk fees to these loans; and (4) other illegal and deceptive acts identified herein, including in failing to disclose the actual amount owed and the interest applicable to the loan.

152. In omitting material information regarding the nature of these transactions, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

153. Plaintiff, as party to the Hometap "Option Purchase Agreement," was deceived by and relied upon Defendants' affirmative failures to disclose.

154. Such acts were deceptive acts or practices which were likely to mislead a reasonable consumer purchasing Defendants' products and services. Said deceptive acts and practices are material.

155. The sale in New York of Defendants' financial services was and is a consumer-oriented act and thereby falls under the New York statute, N.Y. Gen. Bus. Law § 349.

156. A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff.

157. As a direct and proximate result of Defendants' deceptive practices, Plaintiff suffered actual and quantifiable injury and/or damages.

158. Defendants' wrongful conduct caused Plaintiff to suffer an ascertainable loss by causing her to incur damages, including the payment of illegal interest rates.

159. Plaintiff had no notice, actual or otherwise, of Defendants' deceptive practices as Defendants intentionally concealed their wrongful conduct. If Plaintiff had been informed about Defendants' deceptive practices, she would not have entered into the deceptive transactions with the Defendants

160. Plaintiff seeks relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, declaratory relief, and attorneys' fees and costs.

161. Based on the foregoing, Plaintiff has been injured in an amount to be determined at trial, plus damages, interest, attorney's fees, and costs.

## COUNT 3
## New York General Business Law § 350
## (Class Claim)

162. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

163. GBL § 350 provides, in part, as follows:

164. False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

165. GBL § 350(a)(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only

> representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

166. Defendants frequently marketed its services to consumers and targets those consumers, like Plaintiff, but failed to disclose the true nature of those services.

167. Defendants marketed their "Option Purchase Agreements" as not being a loan, misleading Plaintiff and similarly situated consumers.

168. Plaintiff has been injured inasmuch as she relied upon the advertising and signed up for the predatory "Option Purchase Agreement" based on materially omitted information.

169. Defendants' conduct constitutes a violation of GBL § 350.

170. Defendants made the material omissions and misrepresentations described in this Complaint in their advertising and promotional materials provided to their customers.

171. Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Defendants' services were, and continue to be, exposed to Defendants' materially deceptive advertising because of omissions and misrepresentations.

172. Plaintiff had no notice, actual or otherwise, of Defendants' deceptive practices and other breaches. Had Plaintiff known of Defendants' deceptive practices, including the material omissions and misrepresentations regarding the true nature of the transaction she was involved in, she would not consented to the agreement at all.

173. Had Plaintiff known of Defendants' deceptive business practices she would have sought other arrangement for their financial needs.

174. As a result of Defendants' recurring, unlawful deceptive acts and practices, Plaintiff

is entitled to monetary, compensatory, treble and punitive damages, injunctive relief, declaratory relief, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT 4**
**Civil Usury**
**(Class Claim)**

175. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

176. Under N.Y. Gen. Oblig. Law § 5-501, the civil usury statute prohibits loans at rates exceeding 16 percent per annum.

177. Contracts proscribed by the civil usury statute are void.

178. Defendants, through the agreements entered into with Plaintiff, charged Plaintiff interest amounts well in excess of the 16 percent allowed under N.Y. Gen. Oblig. Law § 5-501.

179. Plaintiff is estimated to have paid more than 24 % interest on her loan.

180. Defendants charged Plaintiff and similarly situated entities/individuals rates of interest well above the legal rate by mislabeling its loans as "Option Purchase Agreements."

181. As such, Defendants' agreements with Plaintiff is void and thus not enforceable.

**COUNT 5**
**Unjust Enrichment**
**(Class Claim)**

182. Plaintiff incorporates by reference all preceding allegations.

183. Defendants have unjustly enriched themselves to the detriment of Plaintiff by perpetrating a deceptive business scheme upon Plaintiff including by concealing and then charging usurious rates of interest.

184. Defendants have unjustly enriched themselves to the detriment of Plaintiff by collecting junk fees that serve no legitimate business purpose.

185. Defendants have unjustly enriched themselves to the detriment of Plaintiff by ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

186. Defendants have unjustly enriched themselves to the detriment of Plaintiff by failing to utilize a reconciliation and collection process that complied with applicable state and federal laws.

187. Defendants have unjustly enriched themselves to the detriment of Plaintiffs by utilizing a deceptive and unreasonable debt collection processes that burden and cause further harm to homeowners like Plaintiffs, including the investment fees.

188. Plaintiff and similarly situated individuals have been harmed by these inequitable and unreasonable acts of Defendants.

**COUNT 6**
**Declaratory Judgment and Injunctive Relief, 28 U.S.C. § 2201**
**(Class Claim)**

189. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

190. Plaintiffs seek declaratory relief for the purposes of determining questions of actual controversy between the Class members and Defendants.

191. Defendants have acted in a uniform manner by a) inducing Plaintiffs and other consumers to enter into Option Purchase Agreements that are misrepresented as not constituting loans but which in fact they are mortgage loans in violation of federal and state laws and b) attempting to collect and enforcing those loan obligations.

192. As set forth more particularly above, Plaintiff and the class were deprived of the disclosures and substantive limitations set forth in state and federal law for consumer protection generally, consumer lending, and mortgage lending specifically.

193. As a result, Plaintiff and the class are subjected to contracts that violate the law and are subject to ongoing harm absent a declaration regarding their rights and remedies.

194. Plaintiff seeks declarations to determine their rights and the rights of the Class, in particular, that the Court find that Defendants and Plaintiff and the Class did not enter into any legal contract, either express or implied-in-fact, for Plaintiff and the Class to pay the amounts imposed by the Defendants and declare all such contracts void and declare all attempts to enforce the contracts be contrary to law.

195. In the alternative, Plaintiff seeks declarations that she and the Class have the right to rescind their contracts pursuant to TILA.

196. Accordingly, Plaintiff and members of the Class respectfully ask the Court to issue a declaratory judgment that (a) Defendants' Option Purchase Agreements violate the law and are void and enforceable; (b) that any attempts to enforce the Option Purchase Agreements violate the law; (d) in the alternative, that Plaintiff and the Class have the right to rescind their contracts pursuant to TILA; and (c) such other necessary and proper relief that may be appropriate following the determination of the declarations made.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against the Defendants as follows:

A. An Order certifying the Classes above;

B. An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

C. An Order awarding monetary damages, including but not limited to any statutory, actual, punitive, and treble damages, in an amount to be determined by the Court or jury;

D. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

E. An Order awarding Plaintiff and the Class their reasonable costs and expenses of suit, including attorneys' fees;

F. Such further relief as their Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury as to all issues in the above matter.

By: *<u>/s/ Michael A. Tompkins</u>*__
Michael A. Tompkins
**LEEDS BROWN LAW, P.C.**
134 Mineola Blvd., 2nd Floor
Mineola, NY 11501
Tel : 516-873-9550
Mtompkins@leedsbrownlaw.com

James A. Francis*
**FRANCIS MAILMAN SOUMILAS, P.C.**
John Soumilas*
Lauren KW Brennan*
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel: (215) 735-8600
Fax: (215) 940-8000
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

-

Robert P. Cocco*
**ROBERT P. COCCO, P.C.**
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
bob.cocco@phillyconsumerlaw.com

*Attorneys for Plaintiffs and the Class*

**Pro hac vice petition forthcoming*